UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
In re:                                           :          Chapter 7
                                                 :
ANTHONY GASSON,                                  :          Case No. 12-23703 (RDD)
                                                 :
            Debtor.                              :
------------------------------------------------------x
PREMIER CAPITAL, LLC                             :
                                                 :
            Plaintiff,                           :
                                                 :
            vs.                                  :          Adv. Pro. No. 14-08217 (SHL)
                                                 :
ANTHONY GASSON,                                  :
                                                 :
            Defendant.                           :
------------------------------------------------------x

## POST-TRIAL MEMORANDUM OF DECISION

**A P P E A R A N C E S:**

**CURRAN ANTONELLI, LLP**
*Counsel for Premier Capital, LLC*
260 Franklin Street, Suite 530
Boston, Massachusetts 02110
  By:   Thomas H. Curran, Esq.
        Peter Antonelli, Esq.

**ANTHONY J. GASSON**
*Pro Se*
89 Greenacres Avenue
Scarsdale, New York 10583

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are the merits of the above-captioned adversary proceeding commenced

by Premier Capital, LLC ("Premier" or the "Plaintiff") against the debtor Anthony Gasson (the

"Debtor" or the "Defendant"). The Plaintiff asserts that the Debtor should be denied a discharge

of his debts under three provisions of the Bankruptcy Code: (1) Section 727(a)(2)(A) based on

the Debtor's alleged transfer or concealment of his assets from creditors; (2) Section 727(a)(3) based on the Debtor's alleged failure to produce or maintain records sufficient to ascertain his business transactions and financial condition; and (3) Section 727(a)(5) based on the Debtor's alleged failure to explain the loss of assets and the deficiency of assets to meet his liabilities.  *See generally* Complaint to Deny Debtor's Discharge Pursuant to 11 U.S.C. § 727 and for Other Related Relief [ECF No. 1] (the "Complaint").  The Debtor argues that the Plaintiff has failed to meet its burden of proof under any of these provisions.  A trial in this case took place on June 28, 2017, and July 6-7, 2017, and post-trial briefing was not completed until early 2018.  For the reasons set forth below, the Court finds that the Plaintiff prevails on its claim under Section 727(a)(2) but fails on its claims under Section 727(a)(3) and (a)(5).

## BACKGROUND

The Debtor is licensed as a certified public accountant in New York who worked for Price Waterhouse in the 1970's, helping to uncover frauds and obtain recovery for financial institutions.  Trial Tr. 356:21-22 (July 6, 2017) [ECF No. 95]; Trial Tr. 530:18-22 (July 7, 2017) [ECF No. 96].  The Debtor has been self-employed for 30 years, dating back to the 1980s, working as a financial consultant.  Trial Tr. 344:9-14, 356:21-25 (July 6, 2017); Schedules of Assets and Liabilities, Schedules B and I, Plaintiff's Trial Ex. 1 at Bates 000005-000006, 000014 (listing individual consulting business and New York State certified public accountant license as personal property and noting occupation as self-employed business consultant for the last 30 years).[1]

---

[1]    The Debtor testified in his deposition that he was not employed, but the schedules filed in his Chapter 7 case indicated that he was in fact employed.  Trial Tr. 344:25-347:10 (July 6, 2017).  The Debtor explained this discrepancy by pointing to a possible difference between his and his then-attorney's understanding of self-employment at the time they were creating said schedules.  *Id.* at 345:4-15.

For years prior to filing for bankruptcy, the Debtor provided consulting services through certain of his companies. *See* Plaintiff's Tr. Ex. 1; Trial Tr. 380:3-15 (July 6, 2017). The Debtor's specialty as a financial consultant was in factoring and assisting troubled companies that were in debt or struggling financially, including some of his own companies. Trial Tr. 48:16-49:8 (June 28, 2017) [ECF No. 94]; Trial Tr. 354:12-355:5, 357:1-6 (July 6, 2017); Trial Tr. 474:23-475:6, 482:11-16 (July 7, 2017). During the period of roughly 2001 to 2015, the Debtor worked with approximately three to five such companies, and the Debtor was accustomed to collaborating with workout officers. Trial Tr. 357:7-9 (July 6, 2017); Trial Tr. 482:14-16, 530:21-22 (July 7, 2017).

In the past, the Debtor also operated several companies that manufactured and sold clothing and accessories. Trial Tr. 357:19-21 (July 6, 2017). The Debtor's relationship with Premier arises out of certain loans[2] that were made to the corporate entities with which the Debtor was affiliated.[3] Defendant's Trial Ex. 15; Defendant's Post-Trial Brief at 3 [ECF No. 97]. The Debtor personally guaranteed these corporate loans and these guarantees resulted in several judgments against the Debtor.[4] Compl. ¶ 10; Defendant's Post-Trial Brief at 3;

---

[2]    Certain of the loans were made by Chemical Bank, now J.P. Morgan Chase Bank ("Chase"), while others appear to have been made by First Union National Bank of South Carolina. Plaintiff's Trial Exs. 26-27; Trial Tr. 358:8-16, 368:7-10, 373:4-22, 374:16-21 (July 6, 2017); Defendant's Post-Trial Brief at 3. Premier is the assignee of these entities. Plaintiff's Trial Ex. 27; Trial Tr. 368:7-10, 373:4-22, 374:16-21 (July 6, 2017); Trial Tr. 459:10-16, 479:7-12 (July 7, 2017); Defendant's Post-Trial Brief at 3.

[3]    As discussed below, these companies include T.G. Capital Corp. ("T.G. Capital"), Easley Textiles Corporation ("Easley Textiles"), and Swirl II Ltd., Inc. ("Swirl II" or "New Swirl"). *See* Defendant's Trial Ex. 15 (discussing loan obligations of Easley Textiles and Swirl II); Compl. ¶ 10; Trial Tr. 368:7-10, 373:4-22, 374:16-21 (July 6, 2017).

[4]    Premier asserts that, as the assignee of Chase, it owns three judgments: (1) a $498,500.54 judgment entered on January 16, 2004 in the case of *J.P. Morgan Chase Bank vs. Joseph H. Santarlasci, Jr. and Anthony J. Gasson*, Index No. 004826/2002, New York State Supreme Court, Nassau County; (2) a $72,510.59 judgment entered on November 14, 2008 in the case of *Premier Capital, LLC, assignee in interest to N.C. Venture I, L.P. vs. T.G. Capital Corp. and Anthony J. Gasson*, Index No. 16802-08, New York State Supreme Court, Westchester County; and (3) a $147,026.86 judgment entered on February 25, 2009 in the case of *Premier Capital, LLC, assignee in interest to N.C. Venture, L.L.P. vs. Easley Textile Company, Inc. and Anthony J. Gasson,* Index No. 16800-08, New York State Supreme Court, Westchester County. Plaintiff's Trial Ex. 27; Compl. ¶ 11.

Defendant's Trial Ex. 15; Trial Tr. 454:14-17, 456:6-10, 459:4-9, 476:7-8 (July 7, 2017).  None

of the judgments were listed as disputed in the Debtor's Schedules of Assets and Liabilities.  *See*

Schedules of Assets and Liabilities, Schedules F, Plaintiff's Trial Ex. 1 at Bates 000010-000011.

The Plaintiff alleges that the total indebtedness owed to it by the Debtor exceeds $718,000.00.

Compl. ¶ 12.

The Debtor's business affairs can roughly be broken down into two periods: (1) his work

and business ventures from prior to 2001, which set the stage for the Debtor's financial

difficulties and the debts at issue here, and (2) his work and business ventures after 2001, which

consisted primarily of the Debtor's work for a company named Soroban, Inc. ("Soroban").

### A. Debtor's Affairs Before 2001

#### 1. Swirl

Prior to 2001, the Debtor was part owner in three companies that manufactured and sold

clothing and accessories: Swirl Corporation, Nick Textiles and Easley Textiles.  Trial Tr. 357:19-

21 (July 6, 2017).  The Debtor's business partner Joseph Santarlasci was a co-owner of Swirl.

Defendant's Post-Trial Brief at 3.  Swirl was the principal business and manufactured

housecoats.  Trial Tr. 358:1-2 (July 6, 2017).  Nick Textiles was the manufacturing arm of Swirl

and Easley Textiles was the "trim side" of that business, both feeding into the final product that

Swirl sold.  Trial Tr. 358:2-4 (July 6, 2017).  These businesses were eventually dissolved and

liquidated, and creditors began to look to the Debtor for payment through the personal

guarantees that he had made on the loans to the businesses.  Trial Tr. 359:4-17, 360:7-9 (July 6,

2017).  Swirl filed for Chapter 11 in 1995, along with its sister companies Nick Textiles and

Easley Textiles.  Trial Tr. 359:4-11 (July 6, 2017); Trial Tr. 479:17-19 (July 7, 2017).  At the

time of filing, the company grossed about $18 million in sales, had 350 employees, and occupied

4

125,000- and 6,000-square-feet of space in South Carolina and New York City, respectively.

Trial Tr. 479:23-25 (July 7, 2017). The Swirl line of business continued operations through 2003

but eventually failed, leaving behind a corporate debt of $65,765.82 to the IRS and a

$498,500.54 debt to Chemical Bank, now J.P. Morgan Chase (the "Chase Debt"). Defendant's

Post-Trial Brief at 3; Trial Tr. 358:8-359:3, 360:2-6, 397:20-24 (July 6, 2017). Both debts were

personally guaranteed by the Debtor and his business partner, and the Chase Debt ultimately

became a judgment in 2004.[5]  Trial Tr. 360:7-9 (July 6, 2017); Trial Tr. 476:7-10 (July 7, 2017).

The Plaintiff later purchased the judgment in 2007. Plaintiff's Trial Ex. 27; Trial Tr. 459:10-16,

479:5-8 (July 7, 2017). The Debtor settled the IRS claim relating to Swirl in 1998, upon the sale

of certain property of the Debtor and his wife to satisfy the debt. Defendant's Trial Ex. 21; Trial

Tr. 311:9-18, 365:25-366:10 (July 6, 2017); Trial Tr. 494:22-495:3 (July 7, 2017). The Debtor

and his business partner liquidated the Nick Textiles and Easley Textiles arms of Swirl to pay

previous debt obligations to Chase. Trial Tr. 358:6-24 (July 6, 2017). Nick Textiles and Easley

Textiles both had small lines of credit with First Union National Bank of South Carolina for

approximately $30,000 and $25,000, respectively. Trial Tr. 374:16-21 (July 6, 2017).

Ultimately, the debts of Nick Textiles and Easley Textiles resulted in judgments of $65,246.69

and $27,752.37 against the Debtor personally due to his guarantees. Plaintiff's Trial Ex. 26;

Trial Tr. 368:7-369:14, 374:7-23 (July 6, 2017). These judgments were also subsequently

purchased by Premier. Plaintiff's Trial Ex. 27; Trial Tr. 368:7-369:14, 374:7-23 (July 6, 2017).

---

[5]       In 2000, Chase began corresponding with the Debtor regarding his personal obligations under the
guarantees on the loans. *See generally* Defendant's Trial Ex. 15. By May 2001, Chase had stated that it would take
legal action if accounts past due did not become current. *See generally* Defendant's Trial Ex. 15. Chase ultimately
commenced an action against the Debtor, and, in 2003, was awarded summary judgment against the Debtor in
connection with the guarantee that the Debtor had provided on Swirl's debt, as well as other obligations. *See
generally* Defendant's Trial Ex. 15. The Debtor stated that Swirl made payments to Chase until at least 2004.
Defendant's Post-Trial Brief at 4; Trial Tr. 397:12-22 (July 6, 2017). Thereafter, the hard assets of the Swirl
companies were fully liquidated, and Chase received everything that could be derived therefrom. Trial Tr. 486:9-12
(July 7, 2017).

Around the same time, the Internal Revenue Service also seized assets from the Debtor due to tax debts related to certain of his companies. Trial Tr. 29:22-24 (June 28, 2017); Trial Tr. 393:9-14 (July 6, 2017). The Debtor ultimately sold certain of his and his wife's personal investment property to satisfy the IRS debts and continued making payments over the course of several years, from approximately 1996 to 1998. Trial Tr. 29:18-21 (June 28, 2017). In addition to these debts, the Debtor had personal credit card debt of approximately $85,000, which he represents was paid off after six years of monthly installments. Defendant's Post-Trial Brief at 4, 23; Trial Tr. 493:24-494:4 (July 7, 2017).

The Debtor conceded that during this time, he was "under siege" from creditors and that "there was no easy way [he] could earn any income" due to the pressure put upon him by his creditors. Trial Tr. 392:14-393:14 (July 6, 2017); *see also* Trial Tr. 388:3-9, 391:13-15 (July 6, 2017). During his opening statement at trial in this case, he reiterated that he had been under siege and that he had to deal with pressures relating to Swirl creditors, as well as personal credit card problems. Trial Tr. 29:7-16 (June 28, 2017).

### 2. **T.G. Capital**

T.G. Capital was a corporation through which the Debtor used to provide consulting services in the early 1990's. Trial Tr. 267:5-12, 380:3-8 (July 6, 2017). Foreshadowing the setup of the Debtor's later corporation, Soroban, T.G. Capital had no employees and the Debtor was the only individual who performed services under its auspices. Trial Tr. 380:13-23 (July 6, 2017). The Debtor generated income through the fees paid to T.G. Capital for the Debtor's financial consulting services. Trial Tr. 380:20-23 (July 6, 2017). Similar to the Debtor's arrangement with Soroban, T.G. Capital created a K-1, and the K-1 was filed in the Debtor's personal tax returns. Trial Tr. 380:24-381:9 (July 6, 2017). In addition to the consulting the

6

Debtor provided under T.G. Capital, the company also owned the Swirl business.  Trial Tr. 474:23-475:6 (July 7, 2017).

### B. Debtor's Affairs After 2001

With the financial difficulties described above as a backdrop, the Debtor was involved in a number of companies in the fifteen years leading up to his bankruptcy.

### 1. Soroban

Soroban was formed in 2001 in the name of the Debtor's wife, Jacqueline Gasson ("Mrs. Gasson"),[6] as a means for the Debtor to perform consulting services.  Trial Tr. 285:25-286:3, 301:6-12, 302:13-25, 392:21-393:2 (July 6, 2017); Trial Tr. 495:12-19 (July 7, 2017).  Mrs. Gasson stated that Soroban was created because her husband was not consulting at the time that the company was created, that she and her husband had debts, and that they wanted to make a fresh start.  Trial Tr. 301:9-15, 303:2-7 (July 6, 2017); Trial Tr. 496:5-7 (July 7, 2017).  At Soroban's inception, the Debtor and his wife agreed that the company would neither seek nor obtain bank financing.  Trial Tr. 386:18-23 (July 6, 2017).  The Debtor began providing consulting services through Soroban upon its creation.  Trial Tr. 291:18-21, 397:8-11 (July 6, 2017).

Mrs. Gasson was listed as the sole owner of Soroban, and was chairman of the board, secretary and treasurer of the company.  Trial Tr. 298:16-24 (July 6, 2017).  But Mrs. Gasson had no business or accounting training or experience.  Trial Tr. 288:7-15 (July 6, 2017).  The Debtor was the only individual that did any work for the company through his consulting work; no one else worked for Soroban.  Trial Tr. 299:2-14, 300:6-11 (July 6, 2017).  The Debtor was

---

[6]    Mrs. Gasson has a degree in nursing and has worked full time as a nurse during the time period relevant to this case.  Trial Tr. 286:18-287:16, 287:20-21 (July 6, 2017).

also listed as the president, chief executive officer, and chief operating officer of Soroban, and he
ran the company in this capacity.  Trial Tr. 298:25-299:3, 310:5-15 (July 6, 2017).[7]  Both the
Debtor and Mrs. Gasson had signing authority on Soroban's bank account, but the Debtor signed
the vast majority of checks for the company.  Trial Tr. 312:24-313:6 (July 6, 2017).  The Debtor
was also responsible for moving funds between Soroban's bank accounts.  Trial Tr. 313:9-12
(July 6, 2017).  He prepared and signed all federal tax returns for the company.  Trial Tr. 313:13-
21 (July 6, 2017); Trial Tr. 434:7-14 (July 7, 2017).  Additionally, the Debtor executed several
promissory notes on Soroban's behalf for loans made by Soroban to Genesis Electric Vehicle
Corporation ("Genesis"), a company that was owned by the Debtor's daughter.  Trial Tr. 314:24-
315:4 (July 6, 2017); Trial Tr. 507:17-25 (July 7, 2017).

Mrs. Gasson testified that she had little to no involvement in the operations of Soroban
and did not receive reports concerning Soroban's business or any documents in her capacity as
an officer of the company.[8]  Trial Tr. 307:23-308:13, 311:4-7, 311:19-312:5, 318:16-319:3 (July
6, 2017).  Nor did she feel the need to be involved in the business decisions of Soroban as a
shareholder of the company, so long as the company did not incur any loans or borrow any
money.  Trial Tr. 325:7-24 (July 6, 2017).

The Debtor used a Wells Fargo Visa credit card for both Soroban and personal expenses.
Trial Tr. 323:7-18 (July 6, 2017); Trial Tr. 473:2-8 (July 7, 2017).  The Debtor testified that this
card was issued in 1986 in the name of himself and Mrs. Gasson, though Mrs. Gasson testified

---

[7]    While the trial covered the period of time before the filing of the bankruptcy, the Court understands that the
facts regarding Soroban remain generally true to this day.

[8]    As an initial matter, Mrs. Gasson testified that she did not play any role in the operation of Soroban's
business, either the consulting or the Model's Coats business discussed below.  Trial Tr. 305:11-14 (July 6, 2017).
Mrs. Gasson subsequently testified that her involvement with Soroban was limited to choosing fabrics and styles for
the Model's Coats business.  Trial Tr. 307:20-308:5, 309:6-14, 311:19-312:4 (July 6, 2017).  Mrs. Gasson also
testified that she does not have any Soroban documents and is unaware of the location of Soroban's books and
records.  Trial Tr. 289:23-291:17, 315:11-17 (July 6, 2017).

that she had never used it.  Trial Tr. 335:9-19 (July 6, 2017); Trial Tr. 442:24-444:13 (July 7,

2017).  At some time after 1986, Soroban, Inc. was added as the billing address to this card.

Trial Tr. 444:6-10 (July 7, 2017).  In October 2012, the billing address was changed to

Jacqueline Gasson, on behalf of Soroban, Inc. at the Debtor's home address.  Plaintiff's Trial Ex.

15, 16; Trial Tr. 327:5- 331:3 (July 6, 2017).  Notwithstanding the change, Mrs. Gasson testified

that she never reviewed these card statements.  Trial Tr. 316:8-10 (July 6, 2017).

In 2007, the Debtor began a consulting relationship with a group of entities owned and

controlled by Martin Terzian that are informally referred to by the parties as the Pacific Group.

Trial Tr. 21:1-5, 42:6-19, 44:10-14, 45:14-25, 58:5-59:4 (June 28, 2017).  The Debtor provided

these consulting services through Soroban.  Plaintiff's Trial Ex. 1; Trial Tr. 48:9-15, 68:1-20

(June 28, 2017).  Payment for the Debtor's consulting services was made to Soroban by various

entities within the Pacific Group.[9]  Plaintiff's Trial Ex. 1; Trial Tr. 65:19-66:3, 68:1-20, 69:20-

70:5 (June 28, 2017); Trial Tr. 347:17-23, 382:20-383:3 (July 6, 2017); Trial Tr. 500:8-13 (July

7, 2017).  From approximately 2007 to 2015, Soroban provided financial consulting to entities

within the Pacific Group.[10]  Trial Tr. 44:24-45:1 (June 28, 2017); Trial Tr. 381:24-382:8 (July 6,

2017).  Mr. Terzian had hired the Debtor because Mr. Terzian knew that the Debtor had

experience on both sides of factoring and had worked with financially troubled companies in the

past.  Trial Tr. 45:9-25, 49:4-21, 52:24-53:7 (June 28, 2017).  The consulting services provided

---

[9]      Payments were made to Soroban by various Pacific entities over the years, including IGC, Inc. ("IGC"),
Pacific Worldwide, Inc., and Pacific International Alliance.  Plaintiff's Trial Ex. 28; Trial Tr. 74:12-17, 95:15-96:11,
99:4-8, 104:4-106:25, 109:11-14 (June 28, 2017).  For approximately 10 months prior to the Debtor's bankruptcy in
late 2012, Soroban was paid through ICG for the Debtor's consulting services to the Pacific Group.  Trial Tr.
395:20-24 (July 6, 2017); Trial Tr. 463:13-19 (July 7, 2017).  ICG had two bank accounts, one of which the Debtor
managed and had signature authority over and which was used to pay the consulting income for Soroban.  Trial Tr.
73:5-14 (June 28, 2017); Trial Tr. 395:25-396:16 (July 6, 2017); Trial Tr. 463:17-464:1 (July 7, 2017).

[10]     Mrs. Gasson testified that from 2010 through 2014, the Debtor was working full time, putting in well over
forty hours per week.  Trial Tr. 295:15-296:6 (July 6, 2017).

by the Debtor to the Pacific Group entities included giving financial advice on how to deal with creditors, how to deal with suppliers, and how to deal with banks. *See* Trial Tr. 474:3-8 (July 7, 2017). This included advice on how to deal with problems relating to a lack of money, banks shutting them down and creditors chasing them. Trial Tr. 382:9-19 (July 6, 2017). The Debtor assisted the Pacific Group with, among other things, factoring and financing for the businesses, negotiations with vendors, and guiding certain of the companies through liquidation proceedings. Trial Tr. 48:16-49:1, 59:5-7, 60:4-6, 61:1-2, 63:16-19 (June 28, 2017).

According to Mr. Terzian, there was no contract between the Debtor and the Pacific Group. Trial Tr. 70:6-24, 79:15-80:11 (June 28, 2017). Instead, the parties operated on a "verbal-handshake-type deal," with monthly compensation fluctuating depending on the effort expended by the Debtor and later by the amount that the Pacific Group could afford to pay the Debtor. Trial Tr. 66:7-13, 70:6-24, 79:15-80:11, 109:1-6 (June 28, 2017). In the beginning of the relationship, Soroban was paid approximately $8,000 to $10,000 per month by Pacific Group for the Debtor's consulting services. Trial Tr. 67:8-18, 76:21-77:14 (June 28, 2017). Between 2010 and 2011, that amount had increased to approximately $13,000. Plaintiff's Trial Ex. 28; Trial Tr. 107:16-21 (June 28, 2017). During at least 2013, Soroban had a verbal understanding with the Pacific Group to provide them with consulting services and that compensation for such services was between $10,000 and $13,000 a month. Trial Tr. 395:5-12 (July 6, 2017). In addition, the Debtor received bonuses based on the performance of the Pacific Group companies. Trial Tr. 67:19-23, 77:12-14 (June 28, 2017). Based on Soroban's tax returns, Mr. Terzian's companies appear to have paid Soroban over $1,000,000.00 for the Debtor's work between 2009 and 2012. Plaintiff's Post-Trial Brief at 11; Plaintiff's Trial Exs. 2-6.

Mr. Terzian testified that part of the Debtor's compensation by the Pacific Group included being provided office space in New York City at no cost to the Debtor. Trial Tr. 66:17-67:7, 75:3-76:6 (June 28, 2017); *see also* Trial Tr. 383:4-7 (July 6, 2017).[11] This location was used for consulting services related to Pacific. Trial Tr. 383:4-7 (July 6, 2017); Trial Tr. 501:13-22 (July 7, 2017). Soroban's operations were otherwise conducted out of office space at the Debtor's individual residence at 89 Greenacres Avenue, Scarsdale, New York 10583. Trial Tr. 383:4-7 (July 6, 2017); Trial Tr. 501:13-22 (July 7, 2017).

In addition to the consulting work, Soroban also began doing business using the name of Swirl starting in late 2003 to 2004 and thereafter on a going-forward basis. Trial Tr. 296:23-297:3, 359:18-360:1, 398:4-9 (July 6, 2017); Trial Tr. 496:12-23 (July 7, 2017). Model Coats was a trademark of Swirl, and, in 2004, Soroban started designing, manufacturing and selling apparel under the trade name Model Coats by Swirl. Trial Tr. 297:4-298:14, 385:1-24, 397:6-7 (July 6, 2017); Trial Tr. 461:24-462:3 (July 7, 2017).

The Debtor transferred the Model Coats trademark to Soroban when Swirl was dissolved. Trial Tr. 385:9-14 (July 6, 2017).[12] As of the time of trial, Soroban still held the Model Coats trademark. Trial Tr. 434:15-435:15, 436:1-12 (July 7, 2017). Mr. Terzian testified that as of April 2015, Mr. Gasson's Swirl and Model Coats business was still up and running based on Mr. Terzian's interactions with Mr. Gasson at the office. Trial Tr. 113:10-24 (June 28, 2017).

---

[11]    Mrs. Gasson testified that the Debtor utilized this office with the Pacific Group for approximately seven years. Trial Tr. 294:7-23 (July 6, 2017). He would go work in this office approximately three to five full days per week, presumably working from his home for the remaining time. Trial Tr. 294:7-296:6 (July 6, 2017).

[12]    At a certain point, the Debtor testified that Swirl II was a separate corporation in which the Debtor held an interest, stating that Swirl had "different variations," including the names Swirl, Swirl II and New Swirl. Trial Tr. 397:25-398:3 (July 6, 2017). While the Debtor at first testified that Swirl held the Model Coats trademark, he later testified that Swirl II was the entity that held the Model Coats trademark that was transferred to Soroban. Trial Tr. 385:9-14 (July 6, 2017); Trial Tr. 449:14-16 (July 7, 2017). Whatever entity held the Swirl trademark, it is clear from the testimony that the trademark was transferred to Soroban.

Soroban paid nothing to Swirl for the transfer of the Model Coats trademark, with the Debtor contending at trial that the trademark had been abandoned. Trial Tr. 385:15-386:12 (July 6, 2017). The Debtor also testified that he considered the more than $100,000 worth of Swirl obligations that he had personally paid to the IRS and others to be compensation for the transfer of the Model Coats trademark to Soroban. Trial Tr. 385:25-386:12 (July 6, 2017).

For several years leading up to 2012 and beyond, Soroban had revenues around or in excess of $200,000 a year. Trial Tr. 387:3-14 (July 6, 2017). The trial record focuses on details for certain years. In 2009, for example, Soroban had gross revenues of $193,877.00. Trial Tr. 432:1-14 (July 7, 2017). In 2010, Soroban's gross revenue was $375,646; in 2011, $307,207; and in 2012, $236,252. Plaintiff's Trial Ex. 2-5; Trial Tr. 433:4-7, 434:15-17, 437:3-5 (July 7, 2017). Soroban's total assets in cash and inventories at the beginning of 2011 were $111,676. Plaintiff's Trial Ex. 4; Trial Tr. 435:4-8 (July 7, 2017). The vast majority of the revenue from Soroban during the year preceding and year after the bankruptcy was from the consulting that the Debtor performed. Trial Tr. 387:22-388:2 (July 6, 2017). The business's remaining revenues stemmed from the sale of product. Trial Tr. 433:11-14 (July 7, 2017).

From 2001 through the time of the filing of bankruptcy, the Debtor received his income from consulting through Soroban. Trial Tr. 348:14-18 (July 6, 2017). Once again, the trial record provides details for particular years. The Debtor's statement of financial affairs filed in his bankruptcy case lists the Debtor's and his spouse's joint income in 2011 as $107,000. Trial Tr. 350:7-17 (July 6, 2017). And ten months into the year 2012, the Debtor listed their year-to-date income as $72,736.83—$66,736 of which was from his wife's income and $6,000 from his own. Trial Tr. 350:18-351:19 (July 6, 2017). According to the Debtor's bankruptcy schedules, his income from Soroban was approximately $600 a month, which he referred to as an

"allowance." *See* Schedules of Assets and Liabilities, Schedule I, Plaintiff's Trial Ex. 1 at Bates 000014; Trial Tr. 346:5-10, 351:6-19 (July 6, 2017). The schedules also stated that the Debtor received an "irregular and approximate" income of $6,000 from IGC, a company owned by Mr. Terzian. *See* Schedules of Assets and Liabilities, Schedule I, Plaintiff's Trial Ex. 1 at Bates 000014; Trial Tr. 70:25-71:2 (June 28, 2017). Notwithstanding all this, the Debtor's 2012 tax return did not show any income for the Debtor. Trial Tr. 379:24-380:2 (July 6, 2017).

During the period of 2010 through 2014, the Debtor used Soroban funds to pay certain of his and his wife's expenses directly from Soroban's bank account. Defendant's Trial Ex. 19-G; Trial Tr. 381:19-23 (July 6, 2017); Trial Tr. 471:13-472:4 (July 7, 2017); Trial Tr. 510:8-9 (July 7, 2017). This included household expenses, such as the Debtor's heating, water and sewer bill at the residence where they lived and which also served as an office for Soroban. Trial Tr. 322:23-323:6, 324:23-325:6 (July 6, 2017). The vast majority of Soroban checks made out to cash were allowances for the Debtor and his wife. Trial Tr. 321:8-322:14 (July 6, 2017); Trial Tr. 470:5-14 (July 7, 2017). Mrs. Gasson testified that through this process, she was provided $250 per week by the Debtor for her allowance, and that the Debtor would keep the remainder of the amount withdrawn for himself. Trial Tr. 321:2-322:14 (July 6, 2017); *see also* Defendant's Post-Trial Brief at 16 (stating that Soroban disbursed $400 per week to the Debtor and his wife for household and commuting expenses). Soroban also paid for certain publications read by the Debtor, such as The Economist, The Wall Street Journal, The New York Times, and The Journal News. Trial Tr. 505:10-506:14 (July 7, 2017). Certain larger checks were for travel that the Debtor claims was business-related. Trial Tr. 470:8-10, 508:9-15 (July 7, 2017). Other amounts covered by Soroban included remodeling expenses. Trial Tr. 510:15-16 (July 7, 2017).

Alexandra and Jamie Gasson, two of the Debtor's children, never worked for Soroban but nonetheless had checks written out to them on occasion from the Soroban accounts. Trial Tr. 320:7-321:1 (July 6, 2017); 469:14-24 (July 7, 2017). Some of these checks made out to Alexandra Gasson were personal payments, one check having been drawn out and signed by the Debtor as a wedding gift. Trial Tr. 469:14-24 (July 7, 2017). Soroban funds were also given by the Debtor to personal friends—who subsequently repaid these funds—to help them out on a short-term basis. Trial Tr. 509:15-21 (July 7, 2017). In addition to Mrs. Gasson's allowance, the Debtor also wrote several large checks from the Soroban account to his wife to pay their personal tax returns, including checks in the amounts of $10,000 and $11,000. Trial Tr. 471:13-472:7 (July 7, 2017). Still other amounts were for personal dental work and medical expenses for the Debtor and his wife. Trial Tr. 470:23-471:12, 507:14-16 (July 7, 2017). The practice was that checks were paid to Mrs. Gasson to be deposited into her separate bank account to pay non-business credit card bills. Trial Tr. 472:11-14 (July 7, 2017). From 2010 to 2014, whether reflecting personal or business charges, all of the Debtor's Wells Fargo credit card bills were paid directly by Soroban. Trial Tr. 323:7-18 (July 6, 2017); Trial Tr. 473:2-8 (July 7, 2017). During the period of time from approximately 2010 through 2014, the Debtor did not maintain a bank account and was not writing checks out of the bank account maintained by Mrs. Gasson. Trial Tr. 324:13-19 (July 6, 2017).[13] Mrs. Gasson's assumption was that any checks Mr. Gasson was writing during this period of time were being taken out of the Soroban bank account. Trial Tr. 324:21-22 (July 6, 2017).

---

[13]    The Debtor testified that he does not have any records relating to his personal finances because he does not maintain any bank accounts and there were "no transactions." Trial Tr. 376:7, 378:4-379:4 (July 6, 2017); *see also* Trial Tr. 324:13-15, 378:13-16 (July 6, 2017).

## 2. **Companies Other Than Soroban**

Soroban was involved with a few other companies and ventures beyond the Debtor's

financial consulting. One of these—Genesis—was the subject of considerable evidence.

In 2009, Soroban began testing the electronic bicycle business, which led to the creation

of Genesis in 2011. Trial Tr. 135:8-11 (June 28, 2017); Trial Tr. 462:4-8 (July 7, 2017).

Genesis imports electric bikes and sells them in the U.S. Trial Tr. 135:14-19 (June 28, 2017).

Gross revenues for Genesis in 2012 were $47,287. Trial Tr. 146: 18-24 (June 28, 2017); Trial

Tr. 438:13-15 (July 7, 2017). Gross revenues for 2013 were $55,882. Trial Tr. 439:4-14 (July 7,

2017).

One of the Debtor's daughters, Melissa Gasson, is the president and owner of Genesis

and put approximately $11,200 of her own capital into the company. Trial Tr. 133:14-134:7,

159:7-15 (June 28, 2017); Trial Tr. 438:22-25 (July 7, 2017).[14] She does social media,

marketing, sales and design for the company, expending approximately 25 hours per week on

work for Genesis. Trial Tr. 158:3-7 (June 28, 2017). The Debtor serves as the secretary,

treasurer and an officer of Genesis. Trial Tr. 134:20-135:7 (June 28, 2017). The Debtor also

does all office work for the company, including paperwork and financial work, and is in charge

of the books and records for Genesis. Trial Tr. 136:3-6, 136:21-137:8, 143:8 (June 28, 2017).

This work is performed in the company's storefront, as Genesis does not have a business office.

Trial Tr. 136:7-20 (June 28, 2017). The company does not have any accountants or

bookkeepers. Trial Tr. 137:2-8 (June 28, 2017). The Debtor keeps the Genesis checkbook,

register and all business and financial records. Trial Tr. 143:25-144:10 (June 28, 2017). Genesis

---

[14]    Melissa Gasson testified that from 2011 through 2014, she derived no compensation or income from
Genesis, nor had the company paid for any of her expenses. Trial Tr. 156:19-157:5 (June 28, 2017).

had an account with M&T Bank, over which the Debtor and his daughter had signature authority. Trial Tr. 463:3-9 (July 7, 2017). Over the years, the Debtor signed virtually all of the checks written by Genesis. Trial Tr. 462:24-463:5 (July 7, 2017). The Debtor also prepared the tax returns for Genesis, with Melissa Gasson signing the returns. Trial Tr. 145:10-16 (June 28, 2017); Trial Tr. 437:21-25 (July 7, 2017). The Debtor also hired and arranged the payments to the developer for the Genesis website. Trial Tr. 144:18-145:2 (June 28, 2017). The Debtor also arranged and made payment for business travel by himself and Melissa Gasson related to Genesis. Trial Tr. 148:4-17 (June 28, 2017).

Upon its formation in 2011, Genesis' initial inventory of ten bikes were sold to it by Soroban, and were paid for with money borrowed by Melissa Gasson from Soroban. Trial Tr. 138:5-8, 140:1-141:2 (June 28, 2017). Both this and subsequent orders of bikes were handled by the Debtor. Trial Tr. 138:15-19, 142:2-21 (June 28, 2017). The Debtor also handled the financing of those orders with loans from Soroban. Trial Tr. 142:22-143:8 (June 28, 2017). Soroban provided approximately $116,000 in loans to Genesis, with the promissory notes being signed by the Debtor on behalf of Soroban and Melissa Gasson on behalf of Genesis. Defendant's Trial Ex. 19-H; Plaintiff's Trial Ex. 25 (promissory notes for over $50,000); Trial Tr. 149:10-152:4, 155:1-10 (June 28, 2017); Trial Tr. 507:17-25 (July 7, 2017). Genesis never paid back Soroban for these loans. Trial Tr. 315:2-6 (July 6, 2017). Checks were also made out from the Soroban account to Genesis. Defendant's Trial Ex. 19-G; Trial Tr. 464:12-16 (July 7, 2017). Melissa Gasson testified that Soroban was the source of capital because she did not want any debt and was hoping to have short-lived borrowing from Soroban. Trial Tr. 157:22-158:2 (June 28, 2017). Melissa Gasson never spoke with Mrs. Gasson directly regarding these transactions, testifying that there were talks in the house about lending it and that Mrs. Gasson

would never have never done anything regarding the transfer of money unless she was sure, and that her father handles everything.  Trial Tr. 156:2-13 (June 28, 2017).  Mrs. Gasson testified that the first time she had seen the promissory notes was when preparing for her deposition in this case.  Trial Tr. 314:20-23 (July 6, 2017).

## C. **The Information Subpoena**

In April 2012, several months prior to his bankruptcy filing, the Debtor was served with an information subpoena from creditor Premier concerning his financial affairs, which he completed.  Trial Tr. 439:25-440:18, 446:1-3, 448:14-18 (July 7, 2017).  The Debtor was also served with a subpoena relating to the financial affairs of Soroban, to which the Debtor responded on behalf of Soroban.  Trial Tr. 291:5-17 (July 6, 2017).[15]

In response to questions about his monthly income in the year 2012, "including the source of all income, 1099 income, ownership of corporations or partnerships," the Debtor listed all zeros.  Trial Tr. 441:18-23 (July 7, 2017).  In response to a question requesting information about banking institutions where he presently or in the past six years maintained checking, savings, CD, or investment accounts, either individually or jointly with a third party, the Debtor responded that he had none.  Plaintiff's Trial Ex. 10.  When asked about his monthly living expenses including food, mortgage payments and taxes, the Debtor listed "none."  Plaintiff's Trial Ex. 10; Trial Tr. 442:16-19 (July 7, 2017).  The Debtor also listed that he had no interest in corporations, partnerships and other business entities, and earned no salary from such interests.  Plaintiff's Trial Ex. 10; Trial Tr. 442:20-23 (July 7, 2017).  Concerning the money received from other sources such as family members and spouses to help support him, the Debtor listed a

---

[15]    At her deposition in connection with this adversary proceeding, Mrs. Gasson failed to bring any documents or records requested in the deposition subpoena because she stated she did not keep or maintain such records with respect to Soroban.  Trial Tr. 289:12-290:15, 291:5-11 (July 6, 2017).

monthly allowance of approximately $500 per month, but did not identify the source of such funds. Trial Tr. 444:19-445:4 (July 7, 2017).

Despite questions concerning the source of his spouse's income, her employer and her bank accounts, the Debtor would not provide information about his wife other than her name and home address, deeming other information irrelevant to the matter. Trial Tr. 440:23-441:17 (July 7, 2017); Plaintiff's Trial Ex. 10. Like those related to his wife, the Debtor deemed questions about his children irrelevant. Trial Tr. 442:5-12 (July 7, 2017).

### D. <u>The Bankruptcy Case and the Adversary Proceeding</u>

In late September 2012, the Debtor filed a voluntary petition for relief with this Court under Chapter 7 of the Bankruptcy Code. Compl. at 2; Trial Tr. 342:5-9 (July 6, 2017). In his Schedules of Assets and Liabilities filed in his bankruptcy case, the Debtor represented that he owned only $7,000 in personal property. Schedules of Assets and Liabilities, Schedules B, Plaintiff's Trial Ex. 1 at Bates 000004; Trial Tr. 352:22-24, 355:13-19 (July 6, 2017). As for personal property, the Debtor's Schedules stated that he had no cash on hand or in bank accounts. Schedules of Assets and Liabilities, Schedule B, Plaintiff's Trial Ex. 1 at Bates 000004. With respect to his stock and interest in incorporated and unincorporated businesses, he listed an "individual consulting business" and indicated the value at $0. Schedules of Assets and Liabilities, Schedule B, Plaintiff's Trial Ex. 1 at Bates 000005. When asked his regular income from operation of a business or profession, the Debtor also omitted a value. *See* Schedules of Assets and Liabilities, Schedule I, Plaintiff's Trial Ex. 1 at Bates 000014. He instead listed "in-kind" payments from Soroban and IGC of $600 and (irregularly) $6,000, respectively, under the category of "other monthly income." *See* Schedules of Assets and Liabilities, Schedule I, Plaintiff's Trial Ex. 1 at Bates 000014.

18

On March 31, 2014, the Plaintiff filed the above-captioned adversary proceeding.
Compl. ¶ 1.  Among other things, the Plaintiff argues that the Debtor should be denied a
discharge under Section 727(a)(2)(A) because he allegedly transferred and concealed assets
during the one-year period prior to his bankruptcy filing with the intent to hinder, delay and
defraud creditors.  Plaintiff's Post-Trial Brief at 3.  The Plaintiff asserts that the Debtor holds the
true beneficial and equitable interest in Soroban and that he concealed that interest from his
creditors by, among other things, failing to provide information or documentation to his creditors
regarding his interest in Soroban both prior to and subsequent to his bankruptcy filing.
Plaintiff's Post-Trial Brief at 8-14.  The Plaintiff notes that Soroban was formed when the Debtor
and his assets were being pursued by the IRS and other creditors.  The Plaintiff also notes that
the Debtor used Soroban funds to pay for his personal and household expenses.  Plaintiff's Post-
Trial Brief at 14-15.

The Debtor disputes that the Plaintiff has met the elements of Section 727(a)(2)(A), as
well as the other Sections relied upon by the Plaintiff.  Defendant's Post-Trial Brief at 6-7.  The
Debtor argues that the Plaintiff failed to identify property that he transferred or concealed within
one year of the petition date.  Defendant's Post-Trial Brief at 12-19.  He also argues that he
reasonably believed that the debts he incurred with Chase had been settled pursuant to a
settlement agreement signed by his former partner, Mr. Santarlasci.  Defendant's Post-Trial Brief
at 8-12.  As he was allegedly unaware that Premier was attempting to collect a debt from him,
the Debtor contends that he could not have operated Soroban with the intent of concealing assets
or income.  Defendant's Post-Trial Brief at 8-12.

Prior to this trial, the Debtor had argued that certain of the New York State judgments
upon which Premier relies for its status as a creditor were unenforceable on two grounds: 1) two

judgments from South Carolina upon which certain of the New York State judgments were based were beyond the statute of limitations; and 2) the debt underlying one of the New York State judgments had been resolved as part of a settlement between Chase and the Debtor's former business partner, Mr. Santarlasci. Defendant Post-Trial Brief at 5. The Court held a prior trial on these standing issues on October 14, 2016, and subsequently issued a bench ruling on those issues. Hr'g Tr. 3:7-13 (Feb. 14, 2017) [ECF No. 77]. In that bench ruling, the Court concluded that Premier had standing to proceed with this non-dischargeability action. Hr'g Tr. 4:4-15 (Feb. 14, 2017). More specifically, the Court concluded that the Plaintiff could establish standing through the validity of any one of these three New York State judgments. Hr'g Tr. 4:4-15 (Feb. 14, 2017). The Court noted that while two of the judgments had originated from South Carolina, the Supreme Court of New York, Westchester County had issued its own judgments for those debts. Hr'g 4:21-6:25, 8:6-11:3 (Feb. 14, 2017). The Court further noted that the Debtor was prohibited from challenging in this Court the state court judgments entered by the Supreme Court of New York under the Rooker-Feldman Doctrine. Hr'g Tr. 8:21-10:4 (Feb. 14, 2017). In its ruling, the Court noted the Debtor was not prevented from pursuing his arguments regarding the validity of the New York judgments with the New York State courts to the extent such action is permitted by applicable law. Hr'g Tr. 11:13-16 (Feb. 14, 2017). As to the Debtor's settlement argument, the Court rejected it as plainly inconsistent with the language of the settlement agreement. That agreement was only entered into by Mr. Santarlasci and not by the Debtor. Hr'g Tr. 4:21-7:11 (Feb. 14, 2017). Having already decided the issue of standing, any questions related to the enforceability of these judgments were not within the purview of the non-dischargeability trial and are not addressed in the Court's ruling today.

## DISCUSSION

Chapter 7 of the Bankruptcy Code is designed to provide individual debtors the opportunity for a "fresh start" through the discharge of personal liability for pre-petition debts. To that end, Section 727(a) states that the Court "shall grant the debtor a discharge" unless one of the exceptions enumerated in the statute applies.  11 U.S.C. § 727(a).  Because a denial of discharge is a harsh sanction, Section 727(a) "must be construed strictly against those who object to the debtor's discharge and liberally in favor of the bankrupt."  *Gordon v. Tese-Milner (In re Gordon)*, 535 B.R. 531, 536 (S.D.N.Y. 2015) (quoting *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996)).  At the same time, "the discharge of a bankrupt from his debts is a privilege . . . that has been granted by Congress upon such terms as it has seen fit to impose," and "[a]mong these terms is the requirement that debtors act in good faith and provide full and honest disclosure."  *In re Gordon*, 535 B.R. at 536 (internal citations omitted); *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1589 (2016) ("§ 727(a)(2) is a . . . remedy for actions that hinder the entire bankruptcy process.").  The Plaintiff bears the burden of proving by a preponderance of the evidence that a discharge should be denied based on one or more of the exceptions set forth in the statute.  *In re Gordon*, 535 B.R. at 536.  While the Plaintiff here invokes three provisions of Section 727 in its complaint, it need only prevail on one to deny a discharge.  *See HSBC Bank USA v. Handel (In re Handel)*, 266 B.R. 585, 588 (Bankr. S.D.N.Y. 2001).

### A. The Plaintiff Has Established the Elements of Section 727(a)(2)

Section 727(a)(2) of the Bankruptcy Code precludes discharge when

[T]he debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—(A) property of the debtor, within one year

before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2). As the Plaintiff alleges that the Debtor concealed his property before the date of the filing of the petition, Section 727(a)(2)(A)—rather than (a)(2)(B)—is the relevant statutory section here. *See Pereira v. Gardner (In re Gardner)*, 384 B.R. 654, 663 (Bankr. S.D.N.Y. 2008) ("By the unambiguous text of the statute, concealment alone is sufficient under this subsection.") (internal citations omitted). Under subsection (a)(2)(A), a plaintiff claiming improper concealment of property must show that (i) the property at issue belonged to the debtor; (ii) the debtor concealed it; (iii) the debtor did so with the intent to hinder his creditors, delay them, or defraud them; and (iv) the debtor either did so within one year before the filing of his bankruptcy petition or his initial act of concealment took place before this one-year period but he then allowed the property to remain concealed into the critical year. *Mazer-Marino v. Levi (In re Levi)*, 581 B.R. 733, 744 (Bankr. S.D.N.Y. 2017).

### 1. **The Property Here—Soroban—Belonged to the Debtor**

As the Bankruptcy Code does not specify what constitutes "property of the debtor" for purposes of Section 727(a)(2)(A), courts look to state law to define an interest in property. *Id.* (citing *Kaufman v. Chalk & Vermilion Fine Arts, LLC*, 31 F. App'x 206, 208 (2d Cir. 2002)). But guidance is provided by Section 541(a)(1) of the Bankruptcy Code, which provides that "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541; *see In re Levi*, 581 B.R. at 744; *Pereira v. Summit Bank*, 2001 WL 563730, at *13 (S.D.N.Y. May 23, 2001); *Ng v. Adler (In re Adler)*, 494 B.R. 43, 62 (Bankr. E.D.N.Y. 2013). "Among other things, an asset is any form of personal property with value ... not exempt from liability by statute or common law." *In re Adler*, 494 B.R. at 62 (internal citations omitted). In this regard, "property of the debtor" includes all forms

of tangible and intangible assets under state law. *Id.* at 62–63. But "Congress [nonetheless] intended to limit the reach of § 727(a)(2)(A) only to those transfers of property in which the debtor has a direct proprietary interest." *In re Thurman*, 901 F.2d 839, 841 (10th Cir. 1990).

A debtor's interest in property can be direct, such as a house owned in his or her own name. But it can also be indirect or beneficial, so as to cover instances where ownership is not so obvious. *See, e.g.*, *Darwin (Huck) Spaulding Living Trust v. Carl (In re Carl)*, 517 B.R. 53, 65-66 (Bankr. N.D.N.Y. 2014) (noting that while debtor was not legal owner of property in question, debtor has been found to have equitable interest in property where the property was transferred but debtor retains benefit of beneficial ownership); *see also In re Levi*, 581 B.R. at 744 ("Record title is not determinative of an debtor's equitable ownership."); *Baron v. Klutchko (In re Klutchko)*, 338 B.R. 554, 571 (Bankr. S.D.N.Y. 2005).

In evaluating whether a debtor has a beneficial interest in a business—and thus whether that business should be considered property of the debtor—courts use a multi-factor analysis. *In re Carl*, 517 B.R. at 65. First, courts look at whether a debtor previously owned a similar business. *Id.* at 66 (citing *Cadle Co. v. Ogalin (In re Ogalin)*, 303 B.R. 552, 555 (Bankr. D. Conn. 2004)). Second, courts examine whether the debtor left his previous business venture under financial duress. *Id.* (citing *In re Ogalin*, 303 B.R. at 555–57; *In re Klutchko*, 338 B.R. at 571). Third, and most importantly, courts examine whether the debtor transferred his or her salary, or the right to receive salary to a family member or to a business entity owned by an insider. *Id.* (citing *Coady v. D.A.N. Venture III, L.P. (In re Coady)*, 588 F.3d 1312, 1314 (11th Cir. 2009); *In re Ogalin*, 303 B.R. at 555–56; *In re Klutchko*, 338 B.R. at 571; *In re Frumovitz*, 10 B.R. 61, 65–66 (Bankr. S.D. Fla. 1981); *Marine Midland Bank v. Portnoy (In re Portnoy)*, 201 B.R. 685, 693–95 (Bankr. S.D.N.Y. 1996)). Fourth, courts evaluate whether the debtor is

actively and actually involved in the success of the insider business. *Id.* (citing *In re Frumovitz*, 10 B.R. at 66; *In re Coady*, 588 F.3d at 1314). Fifth and finally, the debtor must retain some of the benefits of the salary, such as having expenses paid for by the insider or the business. *Id.* (citing *In re Coady*, 588 F.3d at 1314; *In re Klutchko*, 338 B.R. at 571).[16] Applying this test here, the Court concludes that the Debtor possessed a beneficial interest in Soroban.

As to the first prong, the Debtor previously owned a similar, if not identical, business in T.G. Capital, through which he provided consulting services. Trial Tr. 380:3-381:9 (July 6, 2017). Indeed, the Debtor's consulting work was the primary business of both T.G. Capital and Soroban. Trial Tr. 291:18-21, 380:3-8, 380:20-23, 387:22-388:2 (July 6, 2017). The vast majority of the revenues from Soroban were from Debtor's consulting work during the years just before and after the Debtor's bankruptcy. Trial Tr. 387:12-14 (July 6, 2017). In short, Soroban was simply another corporate entity through which the Debtor could engage in the same activities as his prior businesses.

As for the second prong of the analysis, the credible evidence establishes that the Debtor left his prior business ventures in financial distress, which led directly to Soroban's creation. More specifically, the record shows that the Debtor and Mrs. Gasson went through difficult economic times and decided to make a new economic start by creating Soroban in her name. Trial Tr. 301:9-302:2, 303:4-7, 304:9-13 (July 6, 2017). Before Soroban's creation, Mrs. Gasson had resolved to no longer accrue debt. Trial Tr. 302:24-25, 304:11-13 (July 6, 2017). Under siege economically, he only had his consulting work to rely upon. Trial Tr. 29:7-16 (June 28, 2017); Trial Tr. 388:3-9, 392:14-393:14 (July 6, 2017). He needed a vehicle for that consulting

---

[16]    Even if these factors are present, a court may grant a discharge if the debtor demonstrates a legitimate reason for the insider business relationship. *Id.* (citing *Old Nat'l Bank v. Reedy (In re Reedy)*, 169 B.R. 28, 30 (Bankr. E.D. Va. 1994) (discharge was granted where the debtor's wife established a corporation because her husband was unable to maintain his consulting business without her help)).

work and that vehicle was Soroban. Trial Tr. 302:24-25, 392:21-393:2 (July 6, 2017); 495:12-19 (July 7, 2017). Thus, the credible evidence establishes that Soroban's creation was motivated by a desire to continue the Debtor's consulting without any of the financial baggage—past or future—from his prior businesses.

Third, the Debtor largely transferred his right to receive a salary into indirect benefits, including monetary benefits to himself and family members. He used the income of Soroban—derived from his efforts—to give an allowance to himself and his wife, to pay his household expenses, to pay numerous personal expenses, and even to provide economic assistance to his children and their endeavors.

The remaining two factors are also satisfied. As to the fourth prong, the credible evidence demonstrates that, while identified as the equity holder, Mrs. Gasson did not have substantive involvement with Soroban. Rather, the Debtor—as its only consultant and worker—was the basis for the entire business. Even though the Debtor technically did not receive a salary from Soroban that flowed into a personal account of his own, he enjoyed the use of funds from Soroban, which satisfies the fifth prong. *See In re Carl*, 517 B.R. at 67; *see also In re Coady*, 588 F.3d at 1315-16.

## 2.  <u>The Debtor Concealed His Interest in Soroban</u>

Courts have most frequently found concealment under Section 727(a)(2) where a debtor transfers legal title to property to a third party while retaining a secret interest in that property. *Minsky v. Silverstein*, 151 B.R. 657, 661 (Bankr. E.D.N.Y. 1993) (internal citations omitted). "Concealment" also exists "when a debtor places assets beyond the reach of creditors or withholds pertinent information when he has a legal duty to disclose it." *In re Levi*, 581 B.R. at 744 (citing *McCarthey Inv. LLC v. Shah (In re Shah)*, 2010 WL 2010824, at *7 (Bankr. S.D.N.Y.

May 13, 2010)) (internal citation omitted).   For example, when a debtor lives in and makes all

mortgage, insurance, and maintenance payments for property owned by another, he may be

found to have fraudulently concealed his interest in the property by maintaining it in another

person's name.  *See id*.

Thus, courts have found concealment of an equitable interest when the debtor diverts "the

fruits of his industry to . . . family members, who then provided him with the use and enjoyment

of material comforts purchased with those fruits."  *In re Coady*, 588 F.3d at 1316.  This is

because a debtor could devote his time and talent to increasing the business's value, but instead

chose to organize his affairs so that "whatever increase in equity came about in the future

through his labor would be protected from his creditors" while still being available for the

debtor's benefit.  *Id.* at 1315.  Concealing "property for the purposes of [Section] 727(a)(2) . . .

can [also] be accomplished by a transfer of title coupled with the retention of the benefits of

ownership."  *In re Olivier*, 819 F.2d 550, 553 (5th Cir. 1987); *see San Jose v. McWilliams*, 284

F.3d 785, 794 (7th Cir. 2002) ("[T]he transfer of title with attendant circumstance indicating that

the bankrupt continues to use the property as his own is sufficient to constitute a concealment.")

(internal citations omitted).

Applying these principles here, the evidence demonstrates that the Debtor concealed his

interest in Soroban.  As explained above, he organized his affairs so that he would receive the

benefit of Soroban without ever making such benefits within the reach of creditors.  His

arrangement of his affairs concealed his interest in Soroban from creditors.  Such concealment is

confirmed in the Debtor's response to Premier's information subpoena in 2012.  In that response,

the Debtor repeatedly denied having any interest or business affiliation with Soroban.  In

response to Questions 13 and 27 specifically, the Debtor claimed no ownership or interest in any

corporations, partnerships, joint ventures or any other business or association or entity, and, in

the same breath, denied receiving a salary from any such venture.  *See* Plaintiff's Trial Ex. 10.

The Debtor continued to be less than forthcoming about Soroban even when he filed for

bankruptcy.  In his Schedules, when asked about his stock or interest in any incorporated and

unincorporated business the Debtor listed zero value for his "individual consulting business."

Plaintiff's Trial Ex. 1 at Bates 000005.[17]  Perhaps most importantly, the Debtor omitted a value

when asked his regular income from operation of a business or profession, instead merely listing

"in-kind" payments from Soroban and IGC of $600 and (irregularly) $6,000, respectively.[18]  *See*

Schedules of Assets and Liabilities, Schedules B and I, Plaintiff's Trial Ex. 1 at Bates 000014.

But the use of the label "in-kind" here is misleading at best,[19] obfuscating the fact that the Debtor

was receiving substantial sums of money and additional value from his consulting business.  At

trial, the Debtor stated that this language was supplied by his attorney, that he did not know the

legal connotation of the phrase "in-kind" and that the focus was more on the amounts as opposed

to the words used in the Schedules.  *See* Trial Tr. 346:5-347:12 (July 6, 2017).  But the fact

remains that the Debtor reviewed the Schedules and Statement of Financial Affairs and signed

them under penalty of perjury.  Trial Tr. 343:10-14 (July 6, 2017).  *C.f. Abraham v. Stuart*, 2016

WL 4045432, at *8 (E.D.N.Y. July 28, 2016) ("A debtor has a paramount duty to carefully

---

[17]     In his Statement of Financial Affairs, in which he was asked to list any businesses in which he was an officer, director, partner or managing executive or in which self-employed in a trade, profession, or other activity, he mentions Soroban and said the nature of the business was trading.  Plaintiff's Trial Ex. 1 at Bates 000023.  But it is clear that the vast majority of Soroban's business was not trading but consulting.

[18]     During the course of discovery in this adversary proceeding and at trial, the Debtor was forced to finally provide more complete information relating to the economic benefits he received from Soroban.  But that was several years after his bankruptcy filing.

[19]     In-kind is defined as "(of payment) in goods or services as opposed to money."  Oxford English Dictionary (November 14, 2018, 11:10 a.m.), https://en.oxforddictionaries.com/definition/in_kind.

consider the questions posed on the petition, schedules, and statements and to verify that all information is correct.") (internal citations omitted).

The Court also seriously doubts the Debtor's credibility as to this testimony, given the level of business sophistication that the Debtor had, including providing consulting services for businesses in financial difficulties and operating his own companies for dozens of years. *See Bank of India v. Gobindram (In re Gobindram)*, 2014 WL 2809078, at *7 (Bankr. E.D.N.Y. June 20, 2014) ("A well-educated, long experienced and sophisticated businessman is expected to answer with more care and accuracy than a financially unsophisticated one . . . The Debtor, an owner and operator of two multi-million dollar businesses, is a sophisticated businessman who has experience in handling and signing important documents.  He should have known to carefully read over all questions before signing the SOFA, and not just the questions for which he provided answers other than 'none.'  The questions themselves were not complex business questions, but rather plain facts that could have easily been answered by the Debtor without the help of his counsel.").  Indeed, the Court notes that this is not the Debtor's first time coming into contact with the bankruptcy process, given that several of his companies filed for bankruptcy in the past.  Moreover, the Debtor's use of the "in-kind" label is consistent with the Debtor's ambiguous, qualified and misleading responses to the information subpoena, pointing to a pattern of obfuscation when dealing with his creditors.  *See In re Gardner*, 384 B.R at 663 ("[A] failure to volunteer is inadequate for concealment but concealment is evidenced when a debtor withholds knowledge or refuses to divulge owed information because there is a 'duty to tell' once a debtor begins to set forth the facts surrounding a subject.") (discussing holding in *In re Portnoy*, 201 B.R. at 694-95); *In re Levi*, 581 B.R. at 744 (noting that concealment exists when a debtor withholds pertinent information that he has a duty to disclose).

The Debtor's lack of a substantive paper trail for his expenses also points towards concealment.  *See, e.g.*, *In re Shah*, 2010 WL 2010824, at *7 (noting debtor's pattern of using wife's name to conceal assets, including fact that bank accounts were in her name though the debtor provided the funding).  Despite operating a business that generated hundreds of thousands, if not millions, of dollars in income, the Debtor maintained no personal bank accounts, instead receiving extensive monetary benefits indirectly.  Trial Tr. 378:4-379:4 (July 6, 2017).  The Debtor took weekly cash allowances out of Soroban's bank account, cashing checks and keeping the money left after giving money to his wife for her allowance.  Trial Tr. 321:2-322:14 (July 6, 2017); Trial Tr. 470:5-14 (July 7, 2017).  Through this arrangement, the Debtor could conceal and protect the fruits of his benefits from Soroban from his creditors.  His obfuscation about this income—or other monetary benefits—from Soroban in his response to the information subpoena and his bankruptcy SOFAs is consistent with this pattern of deception.

### 3.    The Debtor Intended to Hinder His Creditors

Section 727(a)(2) requires that the Debtor have acted with actual "intent to hinder, delay, or defraud a creditor. . . ."  11 U.S.C. § 727(a)(2); *see also In re Levi*, 581 B.R. at 745.  "Actual fraud involves moral turpitude and connotes deceit, artifice, or trick which involves a direct and active operation of intellect which is designed to mislead."  *In re Levi*, 581 B.R. at 745 (internal citations and quotations omitted).  But since the language of the statute is written in the disjunctive, a showing of intent to hinder or delay a creditor is also sufficient to meet the requirements of the statute.  *See id.*  An intent to "hinder" is shown where a debtor acts "with an intent to impede or obstruct creditors," while the intent to "delay" is shown when the debtor acts "with an intent to slow or postpone creditors."  *Id.* (internal citations and quotations omitted).  In

these circumstances, courts focus on whether a debtor has "act[ed] improperly to make it more difficult for a creditor to collect a debt." *Id.* (internal citations and quotations omitted).

Whether a debtor acts with "actual intent to hinder, delay, or defraud" for purposes of Section 727(a)(2) is a fact-specific inquiry. *Id.* As a debtor will not usually admit to intending to act in a fraudulent manner, a court may infer fraudulent intent from the facts and circumstances of the case. *In re Handel*, 266 B.R. at 589; *Republic Credit Corp. I v. Boyer (In re Boyer)*, 328 F. App'x 711, 715 (2d Cir. 2009) (citing *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir. 1983)). An otherwise innocent motive on the part of the debtor can coexist with the intent to hinder or delay creditors. *In re Levi*, 581 B.R. at 745-46 (citing *Rupp v. Pearson*, 658 F. App'x 446, 450–51 (10th Cir. 2016); *First Beverly Bank v. Adeeb* (*In re Adeeb* ), 787 F.2d 1339, 1343 (9th Cir. 1986) (where debtor transferred property "intend[ing] to protect the property from one creditor for the benefit of the other creditors," requisite intent to hinder or delay a creditor under Section 727(a)(2)(A)) was still found)).

An intent to defraud on the part of a debtor is often inferred through the presence of certain "badges of fraud," including:

(i)     lack or inadequacy of consideration,
(ii)    a family, friendship, or close associated relationship between the parties;
(iii)   the retention of position, benefit, or use of the property in question;
(iv)   the financial condition of the party sought to be charged both before and after the transaction in question;
(v)    the existence or cumulative effect of a pattern or series of transactions or course of conduct after incurring of debt, onset of financial difficulties, or pendency of suit by creditors; and
(vi)   the general chronology of the events and transaction.

*In re Gardner*, 384 B.R. at 663–64. While many of the badges are more applicable in the transfer context, the badges can also be applied in determining whether the debtor concealed assets. *See Painewebber Inc. v. Gollomp (In re Gollomp)*, 198 B.R. 433, 440 (S.D.N.Y. 1996).

Given the factual record here, the Court finds that the credible evidence demonstrates that the Debtor intended to hinder his creditors. The first and second badges of fraud—the inadequacy of consideration and the relationship between the parties—support this conclusion. The Debtor's wife received a weekly "allowance" of $250.00 from Soroban despite her lack of involvement in the company and despite not providing any consulting services, the very work that was Soroban's primary source of revenue. Trial Tr. 113:4-7 (July 6, 2017). The Debtor similarly transferred Soroban funds to his children for no consideration, both through direct transfers to them and through support of various business ventures in the form of loans that were never repaid. With respect to the third badge of fraud—the retention of position, benefit, or use of the property in question—the Debtor retained the beneficial use of the assets of Soroban despite not possessing an ownership interest or even admitting to an employee relationship with the company. This included the payment of both his and his family's personal and household expenses, including his and his wife's household heating, water and sewer bills and their medical expenses.

The remaining badges of fraud also support a finding of intent here. The facts here show that Soroban was created to provide a fresh start to the Debtor, free of threat from the Debtor's creditors past and future. The Debtor's wife testified that when she created Soroban in her name she and her husband had been through "rough times" and wanted to make a "new start." Trial Tr. 301:9-20 (July 6, 2017). Before the creation of Soroban, the Debtor's income was subject to the claims of his creditors. The IRS was seizing assets from him, and the Debtor was under threat from other creditors. The Debtor and his wife created Soroban with no intention for Mrs. Gasson to work there herself nor an expectation to hire employees to work there. Trial Tr. 302:6-20 (July 6, 2017). Rather, the Debtor served as the sole consultant for the consulting

business that Soroban operated.  *See* Defendant's Post-Trial Brief at 13.  Despite establishing his

wife as Soroban's sole shareholder, the Debtor essentially maintained exclusive control over the

company and was able to enjoy the fruits of the business as if it were his own.  Operating his

business under the auspices of Soroban allowed the Debtor a safe harbor from creditors and

protected the proceeds of his multi-million-dollar business.

The Debtor asserts that the Court cannot find the requisite intent to hinder creditors

because he was unaware of the debts now owned by Premier.  He alleges that his judgment to

Chase was settled by Mr. Santarlasci and complains about Premier's lack of prior enforcement of

the three judgments.  Defendant's Post-Trial Brief at 6, 8-11.  As a threshold matter, the Court

has already ruled on the standing of Premier as a creditor to bring this action, with the Court

already determining that Premier has such standing.  The Debtor cannot now reargue this issue

here.  In any event, the Debtor's position ignores that Premier is not the only creditor here.  The

Debtor listed other debts in his Schedules besides the judgments purchased by Premier, including

IRS debts in the total amount of $65,765.82.  Schedules of Assets and Liabilities, Schedule F,

Plaintiff's Trial Ex. 1 at Bates 000010.  Moreover, the Debtor's position that he was free of some

of these judgments strains credibility.  *See* Hr'g Tr. 4:21-7:11 (Feb. 14, 2017).  But even more

fundamentally, the Debtor's position ignores that his intent in setting up Soroban was to insulate

himself against any and all creditors that might come along, while retaining the benefits of his

work through Soroban.[20]  In sum, the steps taken by the Debtor in arranging his business affairs

indicate an intent to shield the money he made and the value of Soroban from creditors while

---

[20]    In any event, it is clear that the Debtor was aware of being pursued by creditors as of 2011.  He was
contacted by Premier in 2011 regarding the South Carolina judgments.  *See* Defendant's Post-Trial Brief at 2, 5; *see
also* Defendant's Post-Trial Brief at 23 (stating that the Debtor received a call in 2011 from a debt collector hired by
Premier regarding the South Carolina judgments and that he investigated at the New York Supreme Court clerk's
office and discovered two recorded judgments).  And the information subpoena sent to him before the bankruptcy
was a clear declaration that a creditor was interested in pursuing him.

still benefitting from these assets.  The Debtor ran the company in this manner right up to the

bankruptcy filing.

The Court finds further evidence of the Debtor's intent based upon his response to the

information subpoena and the information contained in the Debtor's bankruptcy Schedules and

Statement of Financial Affairs, which all took place after he became aware of Premier and the

South Carolina judgments in 2011.  The Debtor's responses to the information subpoena

concerning his personal financial condition fly in the face of the reality of his involvement in

Soroban.  In response to questions about his monthly income, for example, the Debtor listed all

zeros.  Plaintiff's Trial Ex. 10 at Bates Premier00052, Premier00055-56.  The Debtor also listed

that he had no interest in any corporations, partnerships and other business entities, and that he

did not derive a salary from any such ventures.  Plaintiff's Trial Ex. 10 at Bates Premier00052,

Premier00055-56.  In response to a question regarding additional sources of income that he

received other than through his employment, the Debtor listed "none."  Plaintiff's Trial Ex. 10 at

Bates Premier00052, Premier00062.  The Debtor's intent to hinder is also reflected in his refusal

to respond to the questions concerning the source of his spouse's income, her employer and her

bank accounts, even though she was the owner of and received money from Soroban.  Plaintiff's

Trial Ex. 10 at Bates Premier00052, Premier00051-52.

The Debtor's subsequent representations in the Schedules and Statement of Financial

Affairs in this bankruptcy provide some additional information but still present far less than a

full picture.  The Debtor's response to the question on his Schedules regarding stock and interest

in incorporated or unincorporated businesses now identifies an "individual consulting business."

Plaintiff's Trial Ex. 1 at Bates 000005.  But the value of that business is listed as zero.  *Id.*  The

Debtor's Schedules now list a monthly income but that income is misleadingly labeled as "in-

kind" from Soroban of $600 and "in-kind' from IGC of $6000 on an irregular basis.[21] *In re*

*Handel*, 266 B.R. at 589 (citing *In re Gollomp*, 198 B.R. at 438); *In re Sofro*, 110 B.R. 989, 991

(Bankr. S.D. Fla. 1990) ("The intent to hinder, delay, or defraud a creditor [under §

727(a)(2)(A)] may be imputed to a debtor where the debtor fails to make a full disclosure of his

liabilities in the petition for relief and omits assets of substantial value from the Schedules.");[22]

*Congress Talcott Corp. v. Sicari (In re Sicari)*, 187 B.R. 861, 871 (Bankr. S.D.N.Y. 1994) (a

"debtor's reckless indifference to the truth has been held to be equivalent of fraud for purposes of

an objection under [Section] 727.").

While the Debtor attempted to explain away the many discrepancies at trial, they are too

numerous and significant to ignore.  Moreover, the Debtor's explanations are not credible given

his background as a sophisticated business person who has consulted and operated his own

companies for dozens of years.  Indeed, this is not the Debtor's first experience with the

bankruptcy process given that several of his companies have filed for bankruptcy in the past.[23]

### 4.   <u>Debtor Concealed His Interest in Soroban Within One Year of the Bankruptcy</u>

Under the final prong of a Section 727(a)(2)(A) analysis, the party objecting to discharge

must establish that the act complained of was done within one year prior to the filing of the

petition.  Importantly, courts have held that the one year requirement can be extended by the

---

[21]     The Debtor also made no attempt to amend his Schedule or Statement of Financial Affairs to rectify such inaccuracies.  *See generally In re Gordon*, 535 B.R. 531 (where the debtor filed amended bankruptcy schedules and twice amended his statement of financial affairs).

[22]     *But see Jensen v. Slater (In re Slater)*, 318 B.R. 881, 886–87 (Bankr. M.D. Fla. 2004) ("While errors on the Chapter 7 debtor's schedules may be sufficient to warrant a denial of the debtors' discharge on the grounds of 'false oaths,' it is not based on concealment." (internal citation omitted)); *see also In re Levi*, 581 B.R. at 745-46.

[23]     In addition to the problematic use of the term "in-kind," other misleading statements or inconsistencies by the Debtor include, but are not limited to, the Debtor answering under oath in his deposition that he was not employed and then in his schedules that he was in fact self-employed.  Trial Tr. 344:25-345:10 (July 6, 2017).  The Debtor explains this discrepancy as arising because "his definition of employment would be one that gets a regular paycheck . . . traditional with businesses, companies, writing paychecks," and that "he never got that."  Trial Tr. 344:15-21 (July 6, 2017).

continuing concealment doctrine.  *In re Gardner*, 384 B.R. at 663.  Under this doctrine, "a concealment within the meaning of Section 727(a)(2)(A) can be found to have existed during the year prior to filing even if the initial act of concealment of assets occurred before this one year period; however the debtor must have continued to conceal his or her interest in the property into the critical year."  *Nate B. & Francis Spingold Found., Inc. v. Halperin (In re Halperin)*, 215 B.R. 321, 331 (Bankr. E.D.N.Y. 1997).

The evidence shows that the Debtor's concealment began more than one year prior to the bankruptcy filing and persisted well into the required one-year period.  The concealment began with the creation of Soroban itself.  Soroban was created in 2001 while the Debtor was under financial stress.  As explained above, it was created to effectively shield the Debtor's assets from the reach of his creditors.  The Debtor's way of conducting his financial affairs persisted into the year prior to the Debtor's bankruptcy filing.  Specifically, in the year prior to the filing, the Debtor continued to serve as the sole consultant for Soroban, while ownership of the Debtor's consulting business was held in the name of the Debtor's wife, despite the fact that she had no significant role in the business of the company.  The earnings derived therefrom were given by the Debtor to his wife and were drawn down by the Debtor himself in the form of cash "allowances"—checks made out to cash which the Debtor them used for himself or distributed to his wife—at least until the time of his 2012 bankruptcy filing.  In this manner, the Debtor was able to insulate his earnings from his creditors, without the need to maintain bank accounts or financial records of his own, or being involved in any personal transactions at all in his own name.

This continuing concealment of his finances during the year prior to the bankruptcy filing is also reflected in the Debtor's responses to the information subpoena before the bankruptcy and

the information he provided in his Schedules and Statement of Financial Affairs filed with the bankruptcy.  Indeed, information on Soroban was only finally produced with candor in the context of this adversary proceeding, during discovery taking place years after Premier had first sought the information.

### B.  The Plaintiff Has Not Established the Elements of Either Section 727(a)(3) or Section 727(a)(5)

Section 727(a)(3) of the Code focuses on a debtor's duty to maintain recorded information which bears on his financial condition and business affairs.  Section 727(a)(3) states that a debtor's discharge will be denied if:

> The debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

Construing a precursor to modern 11 U.S.C. Section 727(a)(3), the Second Circuit has long held the view that, although the Code "make[s] the privilege of discharge dependent on a true presentation of the debtor's financial affairs[,] . . . it is intended only 'that there be available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained.'"  *Berger & Assocs. v. Kran (In re Kran)*, 760 F.3d 206, 210 (2d Cir. 2014) (quoting *In re Underhill*, 82 F.2d 258, 260 (2d Cir. 1936)).

The Plaintiff has failed to show that the facts of this case fall within the scope of Section 727(a)(3).  According to the Debtor, he produced some 1,900 pages of documents to Plaintiff.  Status Conf. Tr. at 4:12, 13:11-14 (Nov. 20, 2015) [ECF No. 88].  Indeed, voluminous records were used in the trial.  The Plaintiff provided no evidence establishing that the Debtor failed to keep records such that his financial condition or business transactions could not be ascertained

either during the pendency of the proceedings or for a reasonable time before.  *See Cadle Co. v. Jacobowitz (In re Jacobowitz)*, 296 B.R. 666, 670 (Bankr. S.D.N.Y. 2003) (quoting *Nof v. Gannon (In re Gannon)*, 173 B.R. 313, 321 (Bankr. S.D.N.Y. 1994)).  In support of its Section 727(a)(3) claim, the Plaintiff highlights the Debtor's cash use, lack of a bank account and responses to the information subpoena.  But Section 727(a)(3) does not require that a debtor maintain a bank account or "an impeccable system of bookkeeping."  *In re Jacobowitz*, 296 B.R. at 670-71 (quoting *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992)).  In the end, the Plaintiff was supplied with sufficient information on which to rely in tracing the Debtor's financial history, even if that information was only provided years after originally requested by Premier or even if the information eventually supplied painted a different picture of the Debtor's financial affairs.  *Id*; *see also Micro Connections, Inc. v. Shah (In re Shah)*, 388 B.R. 23, 32 (Bankr. E.D.N.Y. 2008).

As for Section 727(a)(5) of the Bankruptcy Code, a debtor's discharge may be denied if "the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities."  11 U.S.C. § 727(a)(5).  Section 727(a)(5) does not require fraudulent intent, as under some of the other subdivisions in 11 U.S.C. § 727.  *Prairie Prod. Credit Ass'n v. Suttles (In re Suttles)*, 819 F.2d 764, 766 (7th Cir. 1987).  After the plaintiff presents proof that the debtor possessed assets which are not listed in the petition, the debtor must satisfactorily explain what happened to such assets.  The debtor must explain the loss or deficiency of assets and why such a loss occurred.  *First Federated Life Ins. Co. v. Martin (In re Martin)*, 698 F.2d 883, 886-87 (7th Cir. 1983).  The debtor's explanation should convince the court of his or her good faith and businesslike conduct.  *Filmar, Inc. v. White (In re White)*, 63

B.R. 742, 745 (Bankr. N.D. Ill. 1986); *Schultz v. Shapiro (In re Shapiro)*, 59 B.R. 844, 853

(Bankr. E.D.N.Y. 1986).

To succeed in obtaining a denial of a debtor's discharge under this section, a plaintiff

must establish a *prima facie* case showing a loss or deficiency of the debtor's assets. *In re

Cacioli*, 463 F.3d 229, 238–39 (2d Cir. 2006). "Once this prima facie case has been established,

it is up to the debtor to provide a plausible explanation for the loss or deficiency of the asset."

*Krohn v. Cromer (In re Cromer)*, 214 B.R. 86, 95 (Bankr. E.D.N.Y. 1997) (citing *Hawley v.

Cement Indus. (In re Hawley)*, 51 F.3d 246, 249 (11th Cir. 1995)). "As long as debtor's

explanation convinces the judge that the debtor has not hidden or shielded assets, corroborating

evidence by way of documentation is not necessary in every instance." *In re Cromer*, 214 B.R.

at 97. The debtor's explanation need not be meritorious but satisfactorily account of the

disposition. *In re Gardner*, 384 B.R. at 669; *In re Cacioli*, 463 F.3d at 235.

Applying these principles here, the Court concludes that the request for relief under

Section 727(a)(5) should be denied. The Plaintiff points to Soroban's gross revenues for 2010

through 2012, the Debtor's cash spending, lack of bank accounts and the schedule amounts listed

by the Debtor—$0 in cash and $7,000 in personal property—as proof that Debtor failed to

explain a loss or deficiency of assets. Plaintiff's Post-Trial Brief at 25-27.

But the Debtor has provided sufficient evidence to explain the use of Soroban's credit

card and revenue expenditure generally.[24] The Debtor's expert accountant reviewed Soroban's

total disbursements of $1,135,813 from 2010 to 2014, and found that $216,678 of the

---

[24]    The Plaintiff specifically highlights the Debtor's use of Soroban funds to pay personal and household expenses. Plaintiff's Post-Trial Brief at 26; Trial Tr. 469:25-473:8 (July 7, 2017). Although this use of company funds may be important for purposes of Section 727(a)(2)(A)—as explained above—this Court does not find these expenditures to be unarticulated for purposes of Section 727(a)(5). Moreover, the Debtor further explained several of the more ambiguous business expenses during trial upon this Court's inquiry. Trial Tr. 503:19-510:19 (July 7, 2017).

disbursements were used for personal reasons, at approximately $43,336 per year. Trial Tr. 256:14-18 (July 6, 2017). The Debtor's expert accountant sorted through Soroban's disbursed checks over this period, categorizing and subsequently separating them into vendor categories. Trial Tr. 268:10-17 (July 6, 2017). Apart from the checks themselves, the expert looked at Soroban's bank statements, invoices for the expenses and IRS regulations as to whether there was sufficient backup to support a tax deduction for an expense in categorizing as well. *Id.* at 269:3-6, 271:1-5. Given the roughly 1,800 checks written during this period, payments for their respective amounts were subject to verification procedures with interpolation, meaning that payments to the same payee would be categorized the same way. *Id.* at 260:4-20. Using this method, the expert indicated that he reviewed 87 percent of the total dollars disbursed. *Id.* at 282:1-12.[25]

The Plaintiff also questions the use of Genesis's gross revenue expenditures for 2012 and 2013. Plaintiff's Post-Trial Brief at 26. But while Genesis generated gross revenues of $47,287.00 in 2012 and $55,882.00 in 2013, the evidence shows it netted losses of $16,762.00 and $26,709.00 in its first and second years, respectively. *See* Plaintiff's Trial Exs. 6-7; Trial Tr. 529:10-20 (July 7, 2017). Thus, there do not appear to be any revenues.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court finds in favor of the Plaintiff on its claim under Section 727(a)(2), which results in a denial of discharge. The Plaintiff's claims under Sections 727(a)(3) and 727(a)(5) are denied. The Plaintiff should settle an order on five days' notice.

---

[25]     With regard to the Plaintiff's concerns about Soroban's reusable bag business generating payments from Pacific to Soroban of $1,855,015, the Debtor has provided documents and testimony supporting that the lion's share of the funds received by Soroban were paid to the Chinese supplier of these bags and the freight forwarding company that arranged for the bags to be shipped overseas from China and clear customs. *See* Trial Tr. 91:16-24, 119:4-120:20 (June 28, 2017). As shown on its 2011 tax return, Soroban's net profit from the reusable bag business was only approximately $40,000. *See* Plaintiff's Trial Ex. 4.

The proposed order must be submitted by filing a notice of the proposed order on the Case

Management/Electronic Case Filing docket, with a copy of the proposed order attached as an

exhibit to the notice.  A copy of the notice and proposed order shall also be served upon the

Debtor.

Dated: New York, New York
       December 13, 2018


                                    _/s/ Sean H. Lane_____
                                    UNITED STATES BANKRUPTCY JUDGE